# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEI CONTRACTING AND ENGINEERING, INC., | Case No. 12-cv-01685-BAS(JLB) |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS** |
| v. | **[ECF No. 182]** |
| HANSON AGGREGATES, INC., *et al.*, | |
| Defendants. | |

Plaintiff NEI Contracting and Engineering, Inc. ("NEI") placed orders for concrete by phone with Defendant Hanson Aggregates Pacific Southwest, Inc. ("Hanson"). After accepting delivery of the concrete, NEI refused to pay for it. But NEI's efforts to stiff Hanson crumbled when Hanson produced recordings of its phone orders. The company paid its bill in full.

NEI then filed this putative class action against Hanson based on Hanson's practice of recording customers' phone calls. It hoped to recover millions of dollars in damages on behalf of a class of Hanson's customers. NEI also sought to change Hanson's conduct. The company succeeded on the second point—part way through

the litigation, Hanson voluntarily changed its phone system's admonition to advise customers that their calls may be recorded.

It would turn out to be a Pyrrhic victory. By the time NEI discovered Hanson's new behavior, the company's contingency fee counsel had already invested nearly $300,000 worth of time into this case. Yet, the hope of a large class action recovery never materialized. NEI proceeded to trial on its individual claim against Hanson, and it lost. The company recovered nothing.

Now, NEI turns to California's Private Attorney General Statute and the state's catalyst theory to try to recoup some of its counsel's investment. By leveraging its success in changing Hanson's conduct, the company hopes to subsidize its unsuccessful pursuit of a class action recovery. Thus, NEI seeks to recover all of its attorneys' fees up to the date it discovered Hanson's new behavior. The company also requests this fee amount be increased by a multiplier of 1.75—for a total bounty of almost $500,000. Hanson opposes.[1]

Although NEI achieved partial success, a fee award is not appropriate. NEI does not meet its burden of demonstrating the requirements under California's Private Attorney General Statute and the catalyst theory are satisfied. Consequently, for the following reasons, the Court **DENIES** NEI's motion.

## I.    BACKGROUND[2]

Hanson sells crushed aggregates, ready-mix concrete, and soil amendments to the construction industry. NEI is a general contractor that has purchased concrete products from Hanson since at least 2002. As mentioned above, this case arises from Hanson's practice of recording its customers' phone orders and a billing dispute between the parties that was resolved through reference to recordings of NEI's orders.

---

[1] The Court finds this motion suitable for determination on the papers submitted and without oral argument. *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1).

[2] The following background is adopted from the Court's Findings of Fact and Conclusions of Law (ECF No. 180) and the record in this action.

## A. Hanson's Recording Practice

Hanson receives orders for ready-mix concrete and aggregate materials through its dedicated phone order line. Before the order is placed, the customer generally speaks with Hanson's sales and specifications departments to determine what is needed and the pricing of the order. None of these calls, nor calls to Hanson's administrative or billing departments, is recorded. However, Hanson does record all calls that come into its dispatch lines, which are used when a customer actually places an order.

Prior to July 15, 2009, Hanson used a Voice Print International ("VPI") phone system. While the VPI system was in place, Hanson used "beep tone generators" on all of its telephones that received calls to the dispatch lines. The beep tone generators qualified as notice of recording.

NEI's owner and president is Eric Barajas. Various NEI employees, including Rich Degraffenreid, Sandy LeFever, and Charles Alexander, had authority to and did place orders with Hanson on behalf of NEI from job sites using their cell phones. Thus, NEI employees placed orders through Hanson's dispatch lines prior to July 15, 2009, and heard the audible beep tones generated by Hanson's beep tone generators. Accordingly, prior to July 15, 2009, NEI knew it was being recorded when its employees called the Hanson dispatch lines and therefore consented to the recording.

In July 2009, Hanson replaced its VPI system with an OAISYS Talkument phone system. As part of this phone system, Hanson included a pre-recorded verbal admonition stating that the call "may be monitored for quality assurance" to any customers calling through the dispatch lines. NEI continued to place orders with Hanson after it switched to the OAISYS Talkument phone system.

## B. Billing Dispute

In 2011, NEI placed orders with Hanson in conjunction with its work on a construction project. Mr. Degraffenreid was the superintendent on the project. He,

Mr. Alexander, and Mr. LeFever all had authority to place orders in conjunction with this project. The original estimate for the project was 100 cubic yards of concrete. In fact, however, the project used over 600 cubic yards of concrete. Hanson thus billed NEI for this higher amount of concrete.

Mr. Barajas, who was reviewing the Hanson invoices for the project, thought the bill was too high. He did not make inquiry of any of NEI's employees who placed the orders whether the bills were correct or not. Instead, he requested proof from Hanson that the orders belonged to NEI. Hanson provided copies of the original invoices for the concrete orders, but Mr. Barajas still disputed the bills and requested proof that the amount of concrete billed was actually delivered to NEI. Hanson then provided copies of the delivery tickets for the concrete NEI ordered. The delivery tickets were signed by NEI employees at the construction site who accepted delivery of the concrete. However, because many of the signatures were illegible, Mr. Barajas refused to pay the charges.

In response, Hanson filed a lawsuit against NEI and its bond company on December 8, 2011, seeking approximately $66,266.98, plus costs and fees, for unpaid invoices. Mr. Barajas countered that the concrete billed by Hanson could not have been concrete for the construction project at issue because the project did not require the particular strength of concrete being billed. Hanson replied by producing on March 8, 2012, recordings of phone calls with NEI employees that proved NEI had ordered the particular strength of concrete for the project.

After being confronted with invoices, signed delivery tickets, and recordings of NEI employees ordering the concrete, Mr. Barajas acquiesced and settled the case on behalf of NEI in May 2012 and paid the amount invoiced. Hanson agreed to waive any attorneys' fees or interest requested. NEI did not object to Hanson's recording practice during this billing dispute.

//

//

## C.     CIPA Action

Shortly thereafter, on July 6, 2012, NEI filed the present action against Hanson under California's Invasion of Privacy Act ("CIPA") and the Class Action Fairness Act. The company did not try to resolve this dispute before filing suit. NEI's initial pleading raised a putative class claim under California Penal Code section 632, which prohibits the recording of confidential communications. The company, however, ultimately abandoned this claim in favor of a claim under California Penal Code section 632.7, which prohibits the recording of cell phone calls without consent. Thus, NEI's Second Amended Complaint filed on October 29, 2013, alleged Hanson violated section 632.7 by recording its customers' phone calls without their consent. NEI sought $5,000 in statutory damages per violation of section 632.7. It also sought injunctive relief enjoining Hanson's alleged violation of section 632.7.

## D.     Change in Hanson's Conduct

On December 23, 2013—a few months after NEI filed its Second Amended Complaint and clarified its theory of relief—Hanson changed the admonition that customers hear when calling its dispatch lines. The new admonition informs customers that their calls "may be monitored *or recorded* for quality assurance." Hanson disclosed this change on August 8, 2014, in a response to a written discovery request, which NEI's counsel reviewed on August 11, 2014. (Campion Decl. ¶ 3, Ex. A, ECF Nos. 182-2, 183-3.)

## E.     Trial

Ultimately, after the Court resolved a motion for summary judgment and various motions related to class certification, NEI's individual claim and request for injunctive relief remained for trial. Before trial, the Court ruled that NEI could potentially recover $5,000 for every one of the forty-four cell phone calls Hanson allegedly recorded without NEI's consent. Hence, NEI's potential recovery at trial

was $220,000. However, the morning of trial, NEI informed the Court and Hanson that it would be proceeding on only one cell phone call between NEI's principal Mr. Barajas and Hanson on November 21, 2011, and would, therefore, only be seeking damages of $5,000 along with injunctive relief. The parties orally waived their right to a jury and proceeded by way of bench trial.

Following trial, the Court ruled against NEI on the merits and entered judgment in favor of Hanson. Although it lost at trial, NEI now brings a motion to recover the amount of attorneys' fees it incurred up until August 11, 2014—the date it discovered Hanson had changed its conduct. Specifically, NEI seeks to recover its claimed actual fees of $283,397.50, increased by a multiplier of 1.75, for a total of $495,945.63 in attorneys' fees.

## II.    ANALYSIS

NEI brings its request for attorneys' fees under California's Private Attorney General Statute, Cal. Civ. Proc. Code § 1021.5. Under this provision, "a court may award attorneys' fees to a successful party against one or more opposing parties" if the action "has resulted in the enforcement of an important right affecting the public interest" and several additional requirements are satisfied. Cal. Civ. Proc. Code § 1021.5.

Section 1021.5 is "[a]n important exception" in California "to the American rule that litigants are to bear their own attorney fees." *Graham v. DaimlerChrysler Corp.*, 34 Cal. 4th 553, 565 (2004). California enacted the provision "as a codification of the private attorney general doctrine of attorney fees developed in prior judicial decisions." *Maria P. v. Riles*, 43 Cal. 3d 1281, 1288 (1987). This doctrine "rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently

be infeasible." *Woodland Hills Residents Ass'n, Inc. v. City Council*, 23 Cal. 3d 917, 933 (1979). "Thus, the fundamental objective of the doctrine is to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases." *Riles*, 43 Cal. 3d at 1289.

To accomplish this objective, the California Supreme Court has "taken a broad, pragmatic view of what constitutes a 'successful party' " under section 1021.5. *Graham*, 34 Cal. 4th at 565. "In determining whether a plaintiff is a successful party for purposes of section 1021.5, '[t]he critical fact is the impact of the action, not the manner of its resolution.' " *Id.* at 566 (quoting *Folsom v. Butte Cty. Ass'n of Gov'ts*, 32 Cal. 3d 668, 685 (1982)). Therefore, the "trial court in its discretion 'must realistically assess the litigation and determine, from a practical perspective, whether or not the action served to vindicate an important right so as to justify an attorney fee award' under section 1021.5." *Id.* (quoting *Woodland Hills*, 23 Cal. 3d at 938).

Under this pragmatic approach, "[i]t is not necessary for a plaintiff to achieve a favorable final judgment to qualify for attorneys' fees so long as the plaintiff's actions were the catalyst for the defendant's actions, but there must be some relief to which the plaintiff's actions are causally connected." *Coal. for a Sustainable Future in Yucaipa v. City of Yucaipa*, 238 Cal. App. 4th 513, 521 (2015). Thus, the "catalyst theory" for defining a "successful party" allows "an award of attorney fees even when the litigation does not result in a judicial resolution if the defendant changes its behavior substantially because of, and in the manner sought by, the litigation." *Id.*; *see also Vasquez v. State*, 45 Cal. 4th 243, 260 (2008) ("[O]f necessity, a plaintiff who has not succeeded in obtaining 'a judicial resolution' or 'a judicially recognized change in the legal relationship between the parties' must obtain attorney fees under the catalyst theory, or not at all." (citations omitted)).

To recover fees under the catalyst theory, "a plaintiff must establish that (1) the lawsuit was a catalyst motivating the defendants to provide the primary relief sought; (2) that the lawsuit had merit and achieved its catalytic effect by threat of victory, not

by dint of nuisance and threat of expense . . . ; and, (3) that the plaintiff[ ] reasonably attempted to settle the litigation prior to filing the lawsuit." *Tipton-Whittingham v. City of Los Angeles*, 34 Cal. 4th 604, 608 (2004). This theory "saves judicial resources by encouraging the plaintiff to discontinue its litigation after the defendant acquiesces to the remedy initially sought." *Marine Forests Soc'y v. Cal. Coastal Comm'n*, 160 Cal. App. 4th 867, 877 (2008).

Accordingly, if the catalyst theory applies, the plaintiff is considered a "successful party" under section 1021.5. *See Graham*, 34 Cal. 4th at 567. The plaintiff, however, must still then satisfy section 1021.5's remaining requirements to obtain a fee award. Cal. Civ. Proc. Code § 1021.5. These requirements are "established when '(1) plaintiffs' action "has resulted in the enforcement of an important right affecting the public interest," (2) "a significant benefit, whether pecuniary or nonpecuniary has been conferred on the general public or a large class of persons," and (3) "the necessity and financial burden of private enforcement are such as to make the award appropriate." ' " *Millview Cty. Water Dist. v. State Water Res. Control Bd.*, 4 Cal. App. 5th 759, 768 (2016) (quoting *Summit Media LLC v. City of Los Angeles*, 240 Cal. App. 4th 171, 187 (2015)). The party seeking fees under section 1021.5 has the burden "to demonstrate all elements of the statute[.]" *Id.* (citing *Norberg v. Cal. Coastal Comm'n*, 221 Cal. App. 4th 535, 545–546 (2013)). If the catalyst theory's and section 1021.5's requirements are established, the court then determines the appropriate fee award by applying the lodestar method and gauging "whether the lodestar figure should be augmented or diminished by one or more relevant factors." *Cates v. Chiang*, 213 Cal. App. 4th 791, 820 (2013).

In this case, NEI lost at trial. Therefore, the company did not succeed in obtaining "a judicial resolution" that changed Hanson's conduct. *See Vasquez*, 45 Cal. 4th at 260. NEI must then attempt to "obtain attorney fees under the catalyst theory, or not at all." *See id.* Recognizing this limitation, the company argues this case satisfies all of the requirements for it to proceed under section 1021.5 on a catalyst

theory basis. In short, NEI believes that because its lawsuit caused Hanson to change its call admonition to warn customers that their calls may be recorded, NEI should recover all of its attorneys' fees up until the date it discovered Hanson's new behavior. (Mot. 1:2–2:23.)

The Court is unconvinced. NEI does not demonstrate a fee award is appropriate under section 1021.5 on a catalyst theory basis for several reasons. Initially, the company does not show it obtained the primary relief it was seeking in this lawsuit. Second, NEI fails to demonstrate it reasonably attempted to settle this case before filing it. Third, NEI does not establish that the financial burden of private enforcement makes a fee award appropriate. The Court will expound on each of these reasons in turn.

### A. Primary Relief Sought

In non-catalyst cases under section 1021.5—those cases where the plaintiff succeeds in obtaining judicial relief—"it is sufficient if the plaintiff achieved partial success or succeeded on *any* significant issue in the litigation which achieved *some* of the benefit the plaintiff sought in bringing suit." *Marine Forests Soc'y*, 160 Cal. App. 4th at 878. "However, in catalyst cases, the defendant must have provided the plaintiff with the *primary* relief sought." *Id.*

For instance, in *Marine Forests Society*, the plaintiff nonprofit corporation's primary goal was to enjoin the California Coastal Commission from requiring the plaintiff "to remove an experimental man-made reef that it had planted on the ocean floor." 160 Cal. App. 4th at 870. The plaintiff "raised every conceivable theory . . . to prevent this from occurring," including an argument that the Coastal Commission's structure violated the California Constitution's separation of powers clause. *Id.* at 878. "In other words, its primary objective was to preserve the artificial reef." *Id.* The lawsuit did not save the reef. *Id.* However, the case did lead to a determination that the Coastal Commission's structure violated the California Constitution—causing the

legislature to change the Coastal Commission's governing statutes. *Id.* at 870, 878. Based on this partial success, the trial court awarded attorneys' fees to the plaintiff under the catalyst theory for part of the litigation, rationalizing that "[a] significant goal of the litigation was to ensure that the composition of the Coastal Commission complied with the separation of powers doctrine." *Id.* at 878 (alteration in original).

The California Court of appeal reversed. 160 Cal. App. 4th at 881. It reasoned that the allegations of the plaintiff's complaint "disclose[d] that its primary goal was to save its reef, not to" challenge the Coastal Commission's structure. *Id.* at 878. The Coastal Commission, however, "did not provide the primary relief that [the plaintiff] sought." *Id.* at 879. Accordingly, because the plaintiff "failed to establish that [the] defendant provided the primary relief sought in its litigation," the Court of Appeal held the trial court erred in awarding fees under the catalyst theory. *Id.*

Here, NEI argues that Hanson's recording practice "was the basic underlying problem sought to be remedied in this action." (Mot. 2:3–4.) And, because Hanson changed its conduct, NEI claims its action "was the catalyst in bringing about the relief sought in the litigation." (*Id.* 7:16–17; *see also id.* 7:23–8:10.) The complication with this argument is that it does not acknowledge that NEI was seeking other relief in this case—namely, to recover not only tens of thousands of dollars in damages on its own behalf, but also potentially millions of dollars in damages on behalf of a class of Hanson's customers. At the pleadings stage, NEI alleged the amount in controversy exceeded $5 million, and this figure neared $1.053 billion when the company later sought class certification.[3] Further, because NEI omits mention of the other relief it was seeking, the company fails to argue in its motion that its goal of changing Hanson's admonition was "the *primary* relief sought." *See Marine Forests Soc'y*, 160 Cal. App. 4th at 878.

---

[3] NEI requested $5,000 in statutory damages per violation and claimed that Hanson had recorded 210,668 phone calls in violation of CIPA.

Moreover, changing Hanson's admonition was not NEI's primary goal. Rather, the Court finds this goal was incidental to NEI and its counsel's primary objective of obtaining damages on an individual and classwide basis. This conclusion is supported by the fact that NEI continued to prosecute this case after learning Hanson changed its conduct. If NEI was primarily seeking to change Hanson's conduct, it likely would not have continued to litigate this case through trial. *See Marine Forests Soc'y*, 160 Cal. App. 4th at 877 (noting the catalyst theory "saves judicial resources by encouraging the plaintiff to discontinue its litigation after the defendant acquiesces to the remedy initially sought"). In the same vein, the company discloses that its counsel incurred "approximately 2 ½ to 3 times" more in attorneys' fees to prosecute this case after discovering Hanson's changed behavior. (Opp'n 18:21–23; Campion Decl. ¶ 4.) Again, if NEI had already obtained the primary relief it was seeking, it would not have incurred double to triple the amount of attorneys' fees to continue with this case—unless that is, as the Court concludes, NEI's primary goal was to obtain damages, particularly a common fund recovery.

In sum, NEI fails to argue that Hanson provided NEI with the primary relief it was seeking by changing the admonition customers hear when placing phone orders. Further, the Court finds changing Hanson's conduct was not NEI's primary objective in this case. Accordingly, NEI does not demonstrate the catalyst theory's first requirement is satisfied.

### B.     Reasonable Attempt to Settle Before Filing Suit

"In order to be eligible for attorney fees under section 1021.5" in a catalyst case, "the plaintiff must have engaged in a reasonable attempt to settle its dispute with the defendant prior to litigation." *Graham*, 34 Cal. 4th at 560–61; *accord Vasquez*, 45 Cal. 4th at 253; *Tipton-Whittingham*, 34 Cal. 4th at 608. "Lengthy prelitigation negotiations are not required, nor is it necessary that the settlement demand be made by counsel, but a plaintiff must at least notify the defendant of its grievances and

proposed remedies and give the defendant the opportunity to meet its demands within a reasonable time." *Graham*, 34 Cal. 4th at 577.

"[T]his requirement is fully consistent with the basic objectives behind section 1021.5 and with one of its explicit requirements—the 'necessity . . . of private enforcement' of the public interest." *Graham*, 34 Cal. 4th at 577. "Awarding attorney fees for litigation when those rights could have been vindicated by reasonable efforts short of litigation does not advance that objective and encourages lawsuits that are more opportunistic than authentically for the public good." *Id.* Thus, the requirement that the plaintiff engage in reasonable settlement efforts prior to filing suit "is an important categorical rule in section 1021.5 catalyst cases and cannot be ignored merely because the court believes it would be equitable for the plaintiff to receive a fee award or that plaintiff had a good excuse for failing to engage in these efforts." *Cates*, 213 Cal. App. 4th at 816.

That said, the rule requiring a reasonable settlement attempt "should not be applied to bar an attorney fees recovery where to do so would defeat the core purpose of the statute." *Cates*, 213 Cal. App. 4th at 816. It should not be invoked "blindly without any consideration of whether the [settlement attempt] would have made any difference in the need for the lawsuit and whether the plaintiff's motivations were directed toward seeking the relief demanded, as opposed to the recovery of attorney fees." *Id.* at 817; *see also Carian v. Dep't of Fish & Wildlife*, 235 Cal. App. 4th 806, 815 (2015) ("[I]f the trial court finds that attempts to settle the dispute by the plaintiff would have been futile, the plaintiff may not be barred from recovering section 1021.5 attorney fees because of the lack of a settlement attempt.").

To illustrate, in *Carian*, the California Court of Appeal affirmed the denial of a request for attorneys' fees under section 1021.5 where the trial court found the plaintiff did not make a reasonable pre-litigation attempt to settle his dispute. 235 Cal. App. 4th at 819–20. There, the plaintiff was seeking to reopen a recreational trail. *Id.* at 811. He argued he satisfied the reasonable settlement attempt requirement because

he met with an employee of the California Department of Fish and Wildlife about the trail and notified the state attorney general of his intent to seek to reopen the trail. *Id.* at 812. The trial court rejected this argument. *Id.* at 813. The court reasoned that the plaintiff should have at least approached the state agency that had the ultimate authority to allow access to the trail—the California Fish and Game Commission— as opposed to the Department of Fish and Wildlife, which merely enforces the Commission's regulations. *Id.* at 813, 818. The trial court also found the plaintiff offered no evidence that it would have been futile to make further settlement efforts before filing suit. *Id.* at 819. Thus, the court denied the plaintiff's request for fees. *Id.* at 813. Reviewing for an abuse of discretion, the Court of Appeal affirmed for the same reasons. *Id.* at 816–20; *see also Mundy v. Neal*, 186 Cal. App. 4th 256, 259 (2010) (applying the catalyst theory to a fee request under a different statute than section 1021.5 and concluding the plaintiff could not succeed because she did not give the defendant an opportunity to remedy the problem before filing suit).

In this case, NEI does not demonstrate that it made any effort—let alone a reasonable one—to settle the action beforehand. The company nevertheless argues that it should be excused from this requirement because it believes attempting to settle the case would have been futile. (Mot. 9:1–10:21.) NEI does not submit any evidence with its motion to support this position. (*See id.* 10:9–21.) It does, however, advance two arguments on this point. First, the company claims any pre-litigation settlement attempt would have been futile because once the case was filed, Hanson "did not engage in any conduct that would support any other conclusion." (Mot. 10:11–13.) Specifically, NEI highlights that Hanson "argued for years—even at trial—that it believed" its prior admonition to customers that their calls may be monitored was adequate. (*Id.* 10:12–15.) The company also notes Hanson "even filed for summary judgment on that issue, which was denied." (*Id.* 10:15–16.)

This argument is unpersuasive. Most of the conduct NEI highlights occurred after Hanson had already changed its admonition, not before—minimizing its

relevance. This distinction also separates this case from the decision recognizing a futility exception that NEI relies upon—*Cates v. Chiang*, 213 Cal. App. 4th 791 (2013). There, once the plaintiff's grievance was brought to the defendant commission's attention, the commission continued to engage in actions showing that it believed it had done nothing wrong for four years. *Id.* at 815. The commission then finally acquiesced after it received an unfavorable appellate decision in the case. *Id.* at 802. The Court of Appeal reasoned that this conduct, among other evidence, supported the trial court's determination that a pre-litigation settlement attempt would have been futile. *Id.* at 815. In contrast here, although NEI continued to defend its prior admonition, the company had already changed its conduct moving forward— indicating it was not stalwartly opposed to modifying its phone system's admonition. Further, there is a reasonable explanation for why Hanson continued to defend its prior admonition: NEI continued to prosecute this case and pursue its primary objective of recovering sizable damages based on Hanson's past conduct. Thus, this argument does not persuade the Court that a request from NEI to Hanson to change its admonition prior to NEI filing suit would have been futile.

As for NEI's second argument in support of futility, the company argues that because Hanson changed its admonition seventeen and a half months after NEI filed suit, "it is beyond dispute Hanson would not have simply changed its [admonition] because [NEI]'s counsel asked them to do so." (Mot. 10:11–13.) The Court disagrees. A passage of time, alone, does not demonstrate a reasonable attempt to settle the case beforehand would have been futile. Moreover, NEI's emphasis on the length of time that elapsed between the filing of this case and the change in Hanson's admonition overlooks the events that were unfolding in this case. During most of this time period, NEI's pleadings—none of which even mentioned Hanson's original admonition— were uncertain. NEI initially sought relief under California Penal Code section 632, which prohibits the eavesdropping or monitoring of confidential communications. A conversation is confidential under this section "if a party to that conversation has an

objectively reasonable expectation that the conversation is not being overheard or recorded." *Flanagan v. Flanagan*, 27 Cal. 4th 766, 768 (2002); *see also Kight v. CashCall, Inc.*, 231 Cal. App. 4th 112, 122 (2014). Given that Hanson's initial admonition warned its customers that their calls may be monitored, their calls were arguably not confidential communications under section 632 because the customers lacked a reasonable expectation that their conversations were not being overheard or recorded. *See Flanagan*, 27 Cal. 4th at 768; *Kight*, 231 Cal. App. 4th at 122. Hanson, therefore, had a colorable defense to NEI's original action based on its prior admonition.

Yet, in its Second Amended Complaint, NEI abandoned its section 632 claim in favor of a claim under section 632.7. This provision prohibits the recording of a cell phone call without consent, but it does not contain a requirement that the cell phone call be a confidential communication. *See* Cal. Penal Code § 632.7. Hanson's original admonition, by itself, was not sufficient to foreclose liability under this section. The company revised its admonition only several months after NEI clarified its theory of relief. Thus, because a lapse of time by itself is unconvincing, and because NEI's theory of relief was uncertain for most of this time period, the Court is not persuaded by NEI's argument that the length of time between when it filed suit and Hanson changed its conduct demonstrates futility.

In addition to advancing these two unpersuasive arguments, NEI relies on *MacDonald v. Ford Motor Co.*, 142 F. Supp. 3d 884 (N.D. Cal. 2015), to support its futility position. NEI informs this Court that the *MacDonald* court "found a prelitigation demand there would have been futile." (Mot. 9:18–19; *see also id.* 10:4–6.) Indeed, a review of the *MacDonald* court's order reveals it did reach this conclusion—because "the Parties agree[d] that any attempt by Plaintiffs to settle th[e] case would have been futile." 142 F. Supp. 3d at 895. Hanson has made no comparable concession in this case. The Court consequently rejects NEI's attempt to rely on *MacDonald* to support its position.

Accordingly, NEI does not establish that it engaged in any effort to settle this case before filing it. The company also does not show that a reasonable settlement attempt would have been futile. NEI therefore does not satisfy its burden of demonstrating this requirement of the catalyst theory is satisfied.

### C.    Financial Burden of Private Enforcement

Last, the Court shifts to discussing one of the conditions under section 1021.5 that must be satisfied in all cases: "the necessity and financial burden of private enforcement" must be "such as to make the award appropriate." Cal. Civ. Proc. Code § 1021.5. This condition "really examines two issues: [1] whether private enforcement was necessary and [2] whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys." *In re Conservatorship of Whitley*, 50 Cal. 4th 1206, 1214 (2010).

The Court focuses on the financial burden issue in this case. The California Supreme Court has explained:

> In determining the financial burden on litigants, courts have quite logically focused not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield. "An award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' "

*Whitley*, 50 Cal. 4th at 1215 (quoting *Woodland Hills*, 23 Cal. 3d at 941). Thus, this requirement "focuses on the financial burdens and incentives involved in bringing the lawsuit." *Press v. Lucky Stores, Inc.*, 34 Cal. 3d 311, 321 (1983).

Accordingly, "[i]n evaluating the element of financial burden, 'the inquiry before the trial court [is] whether there were "insufficient financial incentives to justify the litigation in economic terms." ' " *Millview*, 4 Cal. App. 5th at 768 (second alteration in original) (quoting *Summit Media*, 240 Cal. App. 4th at 193). An award

under section 1102.5 is not warranted where "the plaintiff had a 'personal financial stake' in the litigation 'sufficient to warrant [the] decision to incur significant attorney fees and costs in the vigorous prosecution' of the lawsuit." *Id.* at 768–69 (alteration in original) (quoting *Summit Media*, 240 Cal. App. 4th at 193–94).

An award is not appropriate where the plaintiff has a sufficient personal financial stake in the litigation because the statute "was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest." *Davis v. Farmers Ins. Exch.*, 245 Cal. App. 4th 1302, 1329 (2016) (quoting *Beach Colony II v. Cal. Coastal Comm'n*, 166 Cal. App. 3d 106, 114 (1985)). "Private attorney general fees are not intended to provide insurance for litigants and counsel who misjudge the value of their case, and vigorously pursue the litigation in the expectation of recovering substantial damages, and then find that the jury's actual verdict is not commensurate with their expenditure of time and resources." *Satrap v. Pac. Gas & Elec. Co.*, 42 Cal. App. 4th 72, 79–80 (1996). Rather, section 1102.5's "purpose is to provide some incentive for the plaintiff who acts as a true private attorney general, prosecuting a lawsuit that enforces an important public right and confers a significant benefit, despite the fact that his or her own financial stake in the outcome would not by itself constitute an adequate incentive to litigate." *Id.* at 80. Thus, in gauging the financial burden, "[t]he relevant issue is 'the estimated value of the case at the time the vital litigation decisions were being made.' " *Millview*, 4 Cal. App. 5th at 769 (quoting *Davis*, 245 Cal. App. 4th at 1330).

California courts have adopted different approaches to evaluating the financial burden requirement. *See Millview*, 4 Cal. App. 5th at 772; *see also Woodfin Suites Hotel, LLC v. City of Emeryville*, No. A123106, 2010 WL 894086, at *3–4 (Cal. Ct. App. Mar. 15, 2010) (unpublished) (collecting numerous cases applying different approaches to this factor). A straightforward approach is illustrated by the California Court of Appeal's decision in *Davis v. Farmers Insurance Exchange*, 245 Cal. App.

4th 1302, 1310 (2016). In that case, the trial court rejected the plaintiff's request for fees under section 1021.5, and the Court of Appeal affirmed on this issue. *Id.* at 1338. In discussing the financial burden inquiry, the court determined the plaintiff's "reasonable expectation of financial benefits from the litigation was sufficient to motivate him to pursue the litigation." *Id.* at 1329. It noted the plaintiff "sought over ten million dollars in damages for his allegedly wrongful discharge," and "he expected to recover hundreds of thousands of dollars for improper wage deductions." *Id.* at 1330. Thus, the court concluded "it was reasonable for the [trial] court to find that at every critical juncture [the plaintiff] expected a substantial financial recovery, and that this was sufficient motivation to pursue the case"—making a fee award under section 1021.5 inappropriate. *Id.*

In this case, NEI briefly addresses why it believes section 1021.5's financial burden requirement is satisfied. (*See* Mot. 16:13–23.) The company argues the cost to it "far exceeded its personal interest in the case," and NEI "had no financial incentive to bring about" a change in Hanson's conduct, "other than what it would receive as a class member's a [sic] pro rata distribution of a class-wide settlement if successful, and a small incentive payment as a class representative." (*Id.* 16:16–20.) In response, Hanson emphasizes the amount of damages NEI was seeking on both an individual and classwide basis and contends it "is ludicrous to argue that these amounts were insufficient to incentivize a private action as just the opposite is true—these amounts are so high that it incentivized NEI and its counsel to take a gamble on a completely meritless claim that it lost on the merits after trial." (Opp'n 14:20–15:2.). Last, in replying to Hanson's emphasis on what NEI hoped to recover, NEI argues that this Court should instead focus on "the actual result" in this case and "the fees necessary to reward [NEI's] counsel for work incurred in obtaining that result." (Reply 8:14–17.)

The Court agrees with Hanson that NEI does not establish there were "insufficient financial incentives to justify the litigation in economic terms." *See*

*Millview*, 4 Cal. App. 5th at 768. At the threshold, the Court declines to adopt NEI's approach of focusing on the "actual result" in this case. That approach is not justified here because it does not adequately consider the "financial *incentives* to participate in litigation—that is, the potential financial benefits, broadly defined—regardless of the actual recovery, if any, from the litigation." *Id.* at 772; *accord Davis*, 245 Cal. App. 4th at 1330 (focusing on the estimated value of the case when litigation decisions were made); *Children & Families Comm'n of Fresno Cty. v. Brown*, 228 Cal. App. 4th 45, 62 (2014) (noting the court is concerned with evaluating "incentives rather than outcomes" under the financial burden requirement). Moreover, the California Court of Appeal has cautioned that the distinction between the estimated value of the case—as opposed to the "actual result"—is significant "when there is substantial disparity between actual recovery and the amount the plaintiffs 'hoped' to recover." *Satrap*, 42 Cal. App. 4th at 79 (quoting *Beasley v. Wells Fargo Bank*, 235 Cal. App. 3d 1407 (1991)).

This action is such a case. There is a substantial disparity between NEI's actual recovery—zero—and the amount NEI and its counsel hoped to recover. NEI does not provide an estimated value of this case "at the time the vital litigation decisions were being made," *see Millview*, 4 Cal. App. 5th at 769, but the Court is confident that it was high enough to incentivize NEI to bring this case without an award of fees under section 1021.5.

As mentioned, NEI brought this case under the Class Action Fairness Act, alleging the amount in controversy exceeded $5 million. The company retained two experienced class counsel—who assert their time is worth $720 and $500 an hour respectively—to pursue class relief. Had NEI succeeded in its primary objective, it would have been able to disperse the higher cost to litigate a class action across the class through the common fund doctrine. Thus, the estimated value of the case at the time key decisions were made—such as when NEI decided to file this action or chose to change its theory of relief in its Second Amended Complaint—included not only

NEI's estimated recovery, but also that of the putative class members. *See, e.g.*, *In re Taco Bell Wage & Hour Actions*, --- F. Supp. 3d ---, 2016 WL 8711436, at *4 (E.D. Cal. July 15, 2016) ("[T]he case law directs the Court to consider the value of the litigation, not the value of the individual claims in a class action."); *see also Beasley*, 235 Cal. App. 3d at 1414 (agreeing with the defendant that in the class action context the court should not limit its inquiry "to each plaintiff's individual stake"), *disapproved of on other grounds by Olson v. Auto. Club of S. Cal.*, 42 Cal. 4th 1142, 1151 (2008).

That said, the Court recognizes that NEI and its counsel may have hoped—but did not expect—to recover the maximum amount of statutory damages in this case. Given that few consumer class actions proceed to trial, a more realistic benchmark for a successful case is the amount parties were settling similar class action claims for at or around the time key litigation decisions were being. The following examples may not fit perfectly with this case's timeline, including the period for which NEI is seeking to recover fees, but they provide a better indication of what the expected value of this case was than NEI's claim that the only financial incentives were a small pro rata recovery and a class representative incentive award.

One example is from early 2014, where Judge Miller approved a CIPA settlement of $11.7 million for 99,884 potential class members. *Reed v. 1-800 Contacts, Inc.*, No. 12-cv-02359 JM BGS, 2014 WL 29011, at *1 (S.D. Cal. Jan. 2, 2014). This case had 12,551 putative class members.[4] Although an imperfect comparison, the $117.14 per class member settlement in *Reed* suggests this case may

---

[4] Because NEI provides the Court with no information on its expected value of the case, it is unclear when NEI discovered the exact number of potential class members. Approximately a month after it learned Hanson had changed its conduct, NEI brought its class certification motion, which stated Hanson had recorded 210,688 calls made by 12,551 unique cell phone numbers. (ECF No. 74-1.) Presumably, NEI discovered this information some time in advance of filing its motion for class certification. In addition, even in its pleadings, NEI alleged there were "thousands, if not more" of CIPA violations, suggesting it always believed the class was significant. (First. Am. Compl. ¶ 19; Second Am. Compl. ¶ 19.)

have had an expected value of around $1.47 million. Another data point is this Court's own approval in 2014 of a $6 million CIPA settlement that equated to $197.49 for each class member. *See McDonald v. Bass Pro Outdoor World, LLC*, No. 13-cv-889-BAS-DHB, 2014 WL 3867522, at *7 (S.D. Cal. Aug. 5, 2014). This outcome would suggest the present case had an expected value of $2.48 million. A third reference point is *Mirkarimi v. Nev. Prop. 1, LLC*, No. 12-cv-2160 BTM DHB, 2015 WL 5022327, at *4 (S.D. Cal. Aug. 24, 2015), where Judge Moskowitz preliminarily approved a CIPA settlement of $14.5 million for 150,000 potential class members—indicating NEI and its counsel could have expected to recover $1.2 million in this case.

Of course, in the end, NEI recovered zero damages. And with NEI providing no evidence of its expected value of the case at the time key litigation decisions were made, it is challenging to make this assessment. But the Court still concludes the prospect of a sizable class action recovery provided sufficient financial incentives to justify this litigation in economic terms. Nothing over the course of this case has indicated otherwise. Therefore, although the case did not pan out as NEI and its counsel hoped, a fee award fee under section 1021.5 is not appropriate. *See Satrap*, 42 Cal. App. 4th at 79–80 (providing fees under section 1021.5 "are not intended to provide insurance for litigants and counsel who misjudge the value of their case, and vigorously pursue the litigation in the expectation of recovering substantial damages, and then" fail to recover an amount that is "commensurate with their expenditure of time and resources").

Thus, because NEI does not demonstrate there were insufficient financial incentives to pursue this case at the time vital litigation decisions were being made, the Court concludes the financial burden of private enforcement does not make a fee award under section 1021.5 warranted. Further, because NEI does not satisfy this requirement—or the two catalyst theory requirements discussed above—the Court

declines to address the remaining requirements of section 1021.5 and the catalyst theory.

### III. CONCLUSION

In light of the foregoing, NEI has not met its burden of demonstrating a fee award under California's Private Attorney General Statute, Cal. Civ. Proc. Code § 1021.5, and the state's catalyst theory is appropriate. The company did not obtain the primary relief it was seeking. NEI also failed to engage in a reasonable settlement attempt before filing this case, and it does not demonstrate an effort would have been futile. Finally, NEI has not shown there were insufficient financial incentives to justify this litigation in economic terms. The Court consequently **DENIES** NEI's motion for attorneys' fees and costs (ECF No. 182).

**IT IS SO ORDERED.**

**DATED: May 31, 2017**

**Hon. Cynthia Bashant**
**United States District Judge**